IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER 571-513-1256, WITH INTERNATIONAL MOBILE EQUIPMENT IDENTITY 354696407941159, THAT IS STORED AT PREMISES CONTROLLED BY AT&T CORPORATION | Case No. 1:25-sw-79 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Charles Rooney, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number 571-513-1256, with International Mobile Equipment Identity ("IMEI") 354696407941159 ("the SUBJECT PHONE"), that is stored at premises controlled by AT&T Corporation ("AT&T"), a wireless telephone service provider headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida 33408.

2.     The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require AT&T to disclose to the government copies of the information further described in Section I of Attachment B, including historical cell site data. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have

been since 2008.  I am currently assigned to the Violent Crimes Task Force of the Washington,

D.C., Field Office. In my capacity as a law enforcement officer, I have conducted arrests and

obtained search warrants and court orders. I have investigated violent crimes, including bank

robberies, armored car robberies, assaults, carjackings, kidnappings, and threats that have

resulted in arrests and convictions.

4.     This investigation relates to three individuals: VINCENT HENRY KIRKLAND,

JR., JAVON RUSTIN LOUIS PAIGE, and BRIANNA MAMIE OCEOLIA ARCHIE. These

three individuals were originally arrested by local law enforcement in August of 2024, on

charges stemming from a robbery that occurred at a Boost Mobile store in Alexandria, Virginia

on July 25, 2024, and another robbery at a Geeks Zone store in Woodbridge, Virginia on August

13, 2024.  On December 10, 2024, criminal complaints were issued in the Eastern District of

Virginia charging KIRKLAND and PAIGE with violating 18 U.S.C. § 924(c)(1)(A)(ii) (use of a

firearm during and in relation to a crime of violence), and ARCHIE with violating 18 U.S.C. §

1951(a) (obstruction of interstate commerce by means of robbery), all in relation to the robbery

that occurred at the Geeks Zone in August 2024. Your Affiant swore out the affidavit in support

of the three criminal complaints. KIRKLAND, PAIGE, and ARCHIE have since been arrested

by the FBI and have had their initial and preliminary/detention hearings within the Eastern

District of Virginia. Criminal histories for KIRKLAND, PAIGE, and ARCHIE revealed that all

three had previous felony convictions.

5.     Based on training and experience in working robbery investigations, your Affiant

is aware that members of a conspiracy often communicate amongst themselves using cellular

devices.  Analysis of these devices and of phone records can show the relationships and

2

connections amongst the members of the group. Members of a conspiracy often use phones during the planning and execution phases as well as after their criminal activity to arrange the sale of contraband and or fruits obtained from the robbery. This search warrant will be asking for historical cell site communications records. Your Affiant is aware that historical cellular transactional records provide specific cell sites and sectors. Within those records, it can give an approximate location of the mobile device, which can be compared against the date, time, and location of a robbery event. Your Affiant is also aware that historical data transaction records can provide possible indication of the device usage and approximate location information of the mobile unit.

6.     The facts in this affidavit come from my personal observations, my training and my experience, a review of police reports and records, as well as information obtained from witnesses and other investigators. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not include each and every fact and matter observed by me or known to the government.

7.     Based on the facts set forth in this Affidavit, there is probable cause to believe that violations of 18 U.S.C. § 924(c)(1)(A)(ii) (use of a firearm during and in relation to a crime of violence), 18 U.S.C. § 1951 (obstruction of interstate commerce by means of robbery), 18 U.S.C. § 922(g) (possession of a firearm by a prohibited person), and 18 U.S.C. § 371 (conspiracy), as they relate to the robberies of the Boost Mobile store located at 6531 Little River Turnpike, Alexandria, Virginia and the Geeks Zone store located at 15060 Cardinal Drive, Woodbridge, Virginia, which took place in July and August of 2024, respectively (the "TARGET OFFENSES"), have been committed. There is also probable cause to search the

3

information described in Attachment A for evidence of these crimes as further described in
Attachment B.[1]

## JURISDICTION

8.      This Court has jurisdiction to issue the requested warrant because it is "a court of
competent jurisdiction" as defined by 18 U.S.C. § 2711. *See also* 18 U.S.C. § 2703(a), (b)(1)(A),
& (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has
jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE AS TO THE OFFENSES[2]

9.      The FBI, the Fairfax County Police Department ("FCPD"), and PWCPD have
been investigating a series of cellular phone store robberies that occurred in the summer of 2024.
As detailed below, law enforcement believes that PAIGE and KIRKLAND participated in a
robbery of a Boost Mobile store on July 25, 2024, during which PAIGE brandished a firearm,
and that PAIGE, KIRKLAND, and ARCHIE participated in a robbery of a Geeks Zone store on
August 13, 2024, during which both PAIGE and KIRKLAND brandished firearms.

The Boost Mobile Robbery

---

[1] The Prince William County Police Department ("PWCPD") detective assigned to the
Geeks Zone robbery that occurred on August 13, 2024, informed your Affiant that she requested
a search warrant for historical cell site records pertaining to telephone number 571-513-1256
three times during the summer of 2024. The first two magistrates who reviewed the search
warrants advised the detective that more information was needed to connect telephone number
571-513-1256 to BRIANNA ARCHIE. The third magistrate advised the detective that additional
information was needed to show that ARCHIE was actively using her phone during the robbery.
After being so advised, the detective did not pursue the search warrant further.

[2] This section in support of probable cause as to the offenses is substantially the same as
the probable cause section in the affidavit in support of the aforementioned criminal complaints.
*See* Case No. 1:24-mj-487, ECF Nos. 1-3 (Complaints) & 4 (Affidavit).

4

10.     On July 25, 2024, at approximately 11:19 a.m., two subjects robbed a Boost Mobile store ("Boost Mobile") located at 6531 Little River Turnpike, Alexandria, Virginia, which is in Fairfax County within the Eastern District of Virginia.  Boost Mobile, which is located in a shopping center with other stores attached on both sides, is a commercial establishment that sells cellular phones and other products and is a business that was engaged in and that affected interstate commerce. In addition to taking items from three victims inside the store, the subjects stole merchandise from Boost Mobile, including approximately 41 phones and approximately $5,000 in United States currency.



(Google Maps Aerial View 6531 Little River Turnpike, Alexandria, Virginia)

11.     Based on surveillance video from Boost Mobile, which included an audio recording from a camera inside the store, the two subjects can be described as follows.  The first individual – referred to herein as "Subject 1" (who, as explained in this affidavit, was later identified as KIRKLAND) – wore dark clothing, gray New Balance sneakers, white gloves with red/orange palms, a hood pulled up over his head, and his face partially covered by what appeared to be a black mask but with his eyes and nose visible.  Subject 1 carried a dark colored backpack.  The

second individual – referred to herein as "Subject 2" (who, as explained in this affidavit, was later identified as PAIGE) – wore a gray top, dark pants, white sneakers with black trim, white gloves with red/orange palms (which appeared similar to those worn by Subject 1), a hood pulled up over his head, and a white covid-style mask that partially covered his face. Subject 2 carried a dark colored backpack and was armed with a black handgun. Both subjects appeared to be black males.





(Subjects 1 & 2 inside Boost Mobile)          (Subject 2 inside Boost Mobile)

(Subject 2's sneakers)

12.     According to Boost Mobile video, as both subjects entered the Boost Mobile, they encountered an employee of the store ("Victim 1"), who was assisting a customer ("Victim 2") at the cash register.  Subject 2 pointed his handgun at the two victims.  According to the audio recording, one of the subjects initially ordered the two victims to lay on the ground, and ultimately both victims were told to get in the back of the store.  Subject 1 started to drag Victim 2 across the floor towards the back and threatened to shoot, before Victim 2 was able to get up and walk to the rear.  In the back of the store, the subjects encountered the store manager ("Victim 3").  According to the audio recording, one of the subjects demanded cellular phones, specifically iPhone 15 Pros.

13.     Surveillance video captured the movement and actions of both subjects and the victims at the back of the store.  Both subjects stomped their feet on the back of Victim 1's head as he laid on the ground.  Subject 2 appeared to stomp his foot down in the area where Victim 2 was lying, but that view was partially obscured.  Subject 2 also struck Victim 3 in the back of the head with what appeared to be the butt end of his handgun.

14.     According to Boost Mobile video, Subject 1 loaded items from the Boost Mobile into his backpack and a trashcan that was inside the store, and Subject 2 also loaded items from the store into his backpack.  Subject 1 fled the store on foot with the trashcan and turned right as he exited, running east.  Before departing, Subject 2 leaned over both Victim 1 and Victim 2.  It was later determined through interviews that both victims were sprayed in the face with what was believed to have been pepper spray.  Based on surveillance video, neither victim appeared to

provoke Subject 2 into being pepper sprayed. Subject 2 fled the store, and surveillance video captured him entering the front passenger side door of a silver vehicle, which drove away.

15.    Victim 3 called law enforcement, and FCPD responded to the scene and interviewed all three victims. Victim 1 reported that his phone was stolen, and Victim 2 and Victim 3 reported that their wallets were stolen. According to surveillance video, Subject 2 appeared to take personal items from Victim 1 and Victim 2 and, at one point, started hitting an object consistent with a phone against a desk in the back room. Victim 1 was treated by medics at the scene and, based on body worn camera footage, had visible abrasions to his cheek and chin.

16.    In addition to video from Boost Mobile, law enforcement recovered surveillance video from other stores within the shopping center, including MetroPCS and Eternal Bridal. Boost Mobile is located between MetroPCS and Eternal Bridal. According to MetroPCS video, at approximately 11:12 a.m., a silver vehicle entered the parking lot of the shopping center from Little River Turnpike and drove east. This vehicle was also seen on the Eternal Bridal video entering the shopping center and driving east in the parking lot. The vehicle continued past Eternal Bridal towards the east end of the shopping center and out of the camera's view. Approximately a minute and a half later, a silver vehicle that appeared to be the same vehicle drove past both Eternal Bridal and MetroPCS. It then slowly reversed and again passed the stores, including Boost Mobile, before driving toward the east end of the shopping center and out of the camera's view.

17.    According to Boost Mobile video, at approximately 11:19 a.m., Subject 1 and Subject 2 entered Boost Mobile. Both subjects came from the direction the silver vehicle was last seen in the Eternal Bridal video. At approximately 11:24 a.m., Subject 1 fled Boost Mobile after the robbery and headed east in the parking lot in the direction the silver vehicle was last seen. Approximately forty seconds later, Subject 2 fled Boost Mobile, and the silver vehicle pulled in

front of Boost Mobile.  According to the Eternal Bridal video, the silver vehicle came from the east end of the shopping center.   Based on a review of video from the various cameras located in the shopping center, the silver vehicle seen at different times is believed to be the same based on color, doors, body style, lights, and wheel style.

 

(Eternal Bridal video of silver vehicle in parking lot prior to Boost Mobile robbery)

18.    Law enforcement received information from a witness who described the getaway vehicle as a silver Mitsubishi Galant with the last four digits of the license plate as either 4967 or 4667.  Through database checks, specifically FLOCK, which is a license plate reader ("LPR") platform, law enforcement identified a silver Mitsubishi Galant with Virginia license plate TVF3999 ("Mitsubishi Galant") that appeared similar in appearance to that of the getaway vehicle based on images seen in FLOCK.

19.    Law enforcement contacted the owner of the Mitsubishi Galant on July 26, 2024, and learned that the vehicle was a rental car.  The owner advised that he rents multiple vehicles through Turo, a peer-to-peer car sharing marketplace that allows users to rent cars directly from owners.  Beginning on or around June 26, 2024 (i.e., approximately one month before the Boost Mobile robbery), the Mitsubishi Galant was rented to a female renter (referred to herein by her initials A.S.V.S.).  The owner advised that at approximately 2:24 p.m. on July 25, 2024 (i.e., 3 hours after the Boost Mobile robbery), that A.S.V.S. asked to trade the Mitsubishi Galant in for

another vehicle. On July 26, 2024, the Mitsubishi Galant was traded in for a Honda Accord. The owner advised that he did not have face-to-face contact during the trade-in. On July 26, 2024, law enforcement conducted a consent search of the Mitsubishi Galant and processed it for evidence, including latent prints. According to a report dated August 16, 2024, the latent prints were examined and at least one print was identified to PAIGE and at least one print was identified to A.S.V.S.

20.    FLOCK data placed the Mitsubishi Galant near an Exxon gas station ("Exxon") located at 6261 Little River Turnpike, Alexandria, Virginia (i.e., approximately one mile from the Boost Mobile), at approximately 9:10 a.m. on July 25, 2024 (i.e., approximately two hours before the Boost Mobile robbery). Exxon surveillance video showed the Mitsubishi Galant enter the parking lot. (Timestamps for the Exxon video appear to be approximately 1 hour behind compared to the FLOCK data.) In video from an exterior camera, the license plate is visible as Virginia tag TVF3999. A black male subject exited the vehicle from the driver's door. The subject went inside the Exxon and purchased two drinks and what appeared to be a packaged set of white gloves with red/orange palms. (Your affiant later went to this Exxon and confirmed that packaged sets of white gloves with red/orange palms are displayed on the same shelf and appear in the same packaging as the item purchased by the subject.) This subject had long dreadlocks and multiple tattoos on both forearms and wore white sneakers with black trim, which appeared similar to the sneakers worn by Subject 2 in the Boost Mobile robbery.

 

(Subject purchasing gloves inside Exxon)    (Subject's sneakers inside Exxon)

21.    The Mitsubishi Galant in the Exxon video appeared similar to the Boost Mobile robbery getaway vehicle based on color, taillight configuration, hubcaps, black grill, and what appeared to be an air freshener hanging from the rearview mirror.  In addition, pictures taken of the Mitsubishi Galant during the consent search on July 26, 2024, showed all those same characteristics, including the air freshener.  During the consent search, the Mitsubishi Galant had minor damage including scratches on the right front passenger side bumper.  In the Eternal Bridal video, those scratches are faintly visible on the bumper.



(Mitsubishi Galant at Exxon)

11



(Mitsubishi Galant at Exxon)

The Geeks Zone Robbery

22.    On August 13, 2024, at approximately 12:14 p.m., two subjects robbed the Geeks Zone store ("Geeks Zone") located at 15060 Cardinal Drive, Woodbridge, Virginia, which is in Prince William County within the Eastern District of Virginia.  Geeks Zone is a commercial establishment that sells and repairs merchandise, including cellular phones, tablets, and play stations and is a business that was engaged in and that affected interstate commerce.  In addition to taking items from two victims inside the store, the subjects stole merchandise from Geeks Zone, including approximately 46 electronic devices, consisting of cellular phones, tablets, iPads, and PlayStations, and approximately $2,000 in United States currency.



(Google Maps Aerial View of 15060 Cardinal Drive, Dumfries, Virginia)

     23.    Based on surveillance video from Geeks Zone, which included an audio recording from a camera inside the store, the two subjects can be described as follows. One individual – referred to herein as "Subject 1" (who, as explained in this affidavit, is believed to be the same as Subject 1 from the Boost Mobile robbery and was later identified as KIRKLAND) – wore a gray hooded sweatshirt, dark pants, New Balance sneakers (which appeared similar to Subject 1's sneakers in the Boost Mobile robbery), and white gloves with red/orange palms (which appeared similar to the gloves worn by both subjects in the Boost Mobile robbery). Subject 1 had the hood of his sweatshirt pulled up over his head and appeared to be wearing a black mask over the lower portion of his face. Subject 1 was armed with a handgun. The second individual – referred to herein as "Subject 2" (who, as explained in this affidavit, is believed to be the same as Subject 2 from the Boost Mobile robbery and was later identified as PAIGE) – wore a black Reebok sweatshirt with white trim, white shirt underneath, multicolored underwear, dark pants, white sneakers with black trim (which appeared similar to Subject 2's sneakers in the Boost Mobile robbery), and white gloves with red/orange palms (which appeared similar to the gloves worn by

13

both subjects in the Boost Mobile robbery).  Subject 2 carried a dark duffle bag and was also armed with a black handgun.  Subject 2 had the hood of his sweatshirt pulled up over his head and appeared to be wearing a black mask over the lower portion of his face.



(Subject 2's sneakers)

22.     At the time of the robbery, Geeks Zone was occupied by an intern of the store ("Victim 1") and the owner of the store ("Victim 2").[3]  According to Geeks Zone video, both subjects entered the store carrying orange traffic cones, which they dropped as they ran toward the back of the store and out of view of the cameras.  According to the audio recording, one or both of the subjects ordered the victims to the ground, asking where the money was, and one of the subjects said, "fill it up" and "put the money in the bag" several times.  According to the audio recording, one of the subjects counted down from five.  The audio recording also captured one subject threatening to shoot, to which the other subject stated: "do not shoot him."

23.     According to Geeks Zone video, Subject 1 had Victim 1 go to the front of the store and demanded money from the register.  Victim 1 appeared dazed and shook his head.  Victim 1

---

[3] "Victim 1" and "Victim 2" in the Geeks Zone robbery are different individuals from "Victim 1" and "Victim 2" in the Boost Mobile robbery, though the victims are referred to consistently within the context of each robbery.

14

was bleeding from the back of his head. Victim 1 was unable to open the register, and Subject 1 pushed Victim 1 back to the rear of the store while saying: "I'm about to shoot you, come back here, you're dead." The Geeks Zone video showed a portion of Subject 1's gun, which appeared to have a tan/brown slide.

24.     According to Geeks Zone video, Subject 2 then brought Victim 2 at gun point to the front of the store to open the register. Victim 2 was holding the top of his head, which also appeared to be bleeding. Victim 2 was able to open the register, and Subject 2 then told Victim 2 to go back to the rear of the store. Eventually both subjects brought both victims back to the front of the store. Subject 1 had Victim 1 hold open a dark-colored laundry-type bag as he emptied merchandise from the display cases into it. In addition to the dark-colored laundry-style bag Subject 1 had, Subject 2 had a big duffle bag that he stuffed merchandise into. Subject 1 fled through the front door of the store, followed by Subject 2 several seconds later.

25.     Victim 2 called law enforcement, and PWCPD responded to the scene and interviewed the victims. Victim 2 advised that the subjects stole his wallet, which included a few hundred dollars, and that he was struck in the head by one of the subjects with a gun. Victim 1 also advised that he was struck by one of the subjects with a gun and that they took cash from his wallet.

26.     Law enforcement canvassed and determined that the subjects originally came from an area to the rear of Geeks Zone. Surveillance video was collected from a tobacco store at the end of the shopping center that showed Subject 1 and Subject 2 walking toward the Geeks Zone prior to the robbery from the direction of the Montclair Montessori School. Both subjects were carrying the orange traffic cones, which they dropped inside Geeks Zone. Both subjects' masks were pulled down at this point, and they both appeared to be black males.



(Subjects 1 & 2 walking toward Geeks Zone)

27.      Two witnesses who were together at the time called 911 and reported seeing a vehicle, which they described as a gray Toyota Prius, drop off two black males wearing "hoodies," one black and the other gray.  The witnesses saw the subjects carrying orange traffic cones and walking toward the 7-Eleven, which is in the direction of and in the same shopping center as Geeks Zone.  The witnesses saw the subjects return to the same vehicle carrying either large trash bags or duffle bags, and the vehicle ran a red light while fleeing the area.  The driver was a heavier set black or Hispanic female, who one of the witnesses described as wearing a light-colored tank top. The witnesses captured pictures of the vehicle.  It should be noted that these witnesses were located behind the Geeks Zone and adjacent to the Montclair Montessori School.



16

(Witnesses' picture of vehicle)

28.    On August 20, 2024, law enforcement contacted one of the witnesses, who provided a similar description to the witnesses' 911 call.  The witness advised that at the time it happened, the witness believed the vehicle was a Toyota Prius but was now not sure.  The witness advised that the vehicle had the look of a Prius.  The witness described the driver as a "larger framed," probably a black female who looked young, in her early to mid-twenties.  She further described the driver as possibly wearing a peach or off-white sleeveless top.  The witness described the driver's hair as curly with volume that was possibly black or brown and might have had bleached tips.  When asked, the witness stated that the driver was not wearing glasses.  In addition, the witness stated that the female driver was the only one in the vehicle waiting.

Identification of PAIGE, KIRKLAND, and ARCHIE

29.    FCPD learned from PWCPD of the Geeks Zone robbery.  Through investigative steps already pursued and ongoing by FCPD, investigators knew that A.S.V.S. (the female renter of the Mitsubishi Galant at the time of the Boost Mobile robbery) was renting a Toyota Scion ("Toyota Scion") during the Geeks Zone robbery and was possibly staying at a Red Roof Inn located at 17113 Dumfries Road, Dumfries, Virginia.  Through social media analysis, a connection was discovered between A.S.V.S. and a Facebook profile with the name "Javon Page."  The Facebook account for "Javon Page" included a series of pictures depicting a black male who matched the subject shown in the Exxon video, including a distinctive tattoo of a woman's face on his forearm.  This tattoo could be seen in the Exxon video.

30.    At that point, through records including prior police contacts, law enforcement identified the person depicted in the Facebook account for "Javon Page" and the Exxon video as PAIGE.



(Virginia DMV photo of PAIGE)

31.    FCPD obtained arrest warrants for PAIGE for the Boost Mobile robbery, and

PWCPD arrested him in Manassas, Virginia, on August 14, 2024.  At the time of his arrest, law

enforcement observed PAIGE near the Toyota Scion and interacting with an individual later

identified and whose initials are J.J.M.[4]  Law enforcement could see what appeared to be a gun

located between the driver's seat and middle console of the Toyota Scion.

32.    On August 15, 2024, FCPD and PWCPD executed a search warrant at the Red Roof

Inn in Dumfries, Virginia, where it was believed PAIGE was staying.  During that search, law

---

[4] At the time of PAIGE'S arrest, law enforcement detained and questioned J.J.M.  It was
reported that J.J.M. had a gap in his front teeth.  Video from the tobacco store for the Geeks
Zone robbery captured Subject 1 outside the Geeks Zone with his mask pulled down; a review of
that video showed that Subject 1 appeared to have a gap in between his front teeth.  (At the time
of KIRKLAND's later arrest on August 29, 2024, law enforcement who interviewed
KIRKLAND advised that KIRKLAND also had a gap between his front teeth.)  After
questioning, law enforcement determined that J.J.M. was not directly involved in the Geeks Zone
robbery, and he was released.
    Virginia Department of Corrections records show that J.J.M. was incarcerated at the same
correctional institution as PAIGE and KIRKLAND in 2023.

enforcement recovered white sneakers with black trim consistent with Subject 2's sneakers in both robberies.

33.    On August 16, 2024, FCPD executed a search warrant for the Toyota Scion and seized a black handgun.  In addition, other items seized included:  a black Reebok sweatshirt with white trim; several bottles of pepper spray; packaging with Geeks Zone labels and identifications numbers that matched the Geeks Zone inventory list of stolen merchandise; a phone with a Geeks Zone label that was on the Geeks Zone inventory list of stolen merchandise; and a driver's license and birth certificate for Victim 2 from the Boost Mobile robbery.  The Reebok sweatshirt was consistent in appearance to what was viewed in the Geeks Zone video.




(Gun from Toyota Scion)                    (Gun from Geeks Zone ATI Bulletin)

34.    Law enforcement collected surveillance video from the Red Roof Inn and surrounding area that revealed the following:  On August 13, 2024, prior to the Geeks Zone robbery, PAIGE was both inside and outside the Red Roof Inn.  (According to Google Maps, the Red Roof Inn is approximately 4.5 miles from Geeks Zone.)  PAIGE wore white sneakers with black trim (which appeared similar to the sneakers worn by Subject 2 in both the Boost Mobile and Geeks Zone robberies) and multicolored underwear (which appeared similar to the

19

multicolored underwear worn by Subject 2 in the Geeks Zone robbery). Based on another camera angle, a person believed to be PAIGE retrieved items from the Toyota Scion. A gray vehicle, which was later determined to be a Honda ("Honda"), arrived at the Red Roof Inn. A black male wearing a gray hooded sweatshirt and dark pants (which appeared similar to the clothing worn by Subject 1 in the Geeks Zone robbery) exited the front passenger seat of the Honda, walked over to PAIGE at the Toyota Scion, and later returned to the front passenger seat of the Honda. PAIGE eventually got into the Honda's rear passenger driver's side seat and was carrying a bag, and the Honda exited the parking lot of the Red Roof Inn.

35.     As the Honda navigated to the main road, it passed surveillance cameras located at an adjacent Motel 6. (There is a discrepancy in video timestamps in that the timestamp of the Red Roof Inn video is approximately 12 minutes behind the timestamp of the Motel 6 video.) Motel 6 video showed that the Honda appeared to have a Virginia license plate. Law enforcement attempted variations of the plate that could be read from the video surveillance and eventually determined the vehicle to be a 2012 Honda bearing Virginia license TJX6878. The vehicle was registered to ARCHIE. The Honda is a hatchback and has features similar to that of a Toyota Prius, which witnesses described as the Geeks Zone robbery getaway vehicle.

 

(Motel 6 video still images of vehicle)

36.    Surveillance video from the Red Roof Inn also showed a similar looking Honda return shortly after the Geeks Zone robbery. Based on the Red Roof Inn video, PAIGE exited the rear driver's side passenger door. Paige wore a white shirt and white sneakers with black trim and appeared to have the black sweatshirt with white trim draped over his shoulder. PAIGE carried a black duffle bag similar to what Subject 2 carried; notably, the shoulder strap of the black duffle bag was not completely attached in both the Red Roof Inn video and the Geeks Zone video.

 

(Still image of vehicle at Red Roof Inn before robbery)    (Still image of vehicle at Red Roof Inn after robbery)

37.    Law enforcement obtained an inventory list of the stolen items from both the Boost Mobile and Geeks Zone robberies, including the IMEI numbers of cellular phones. Through an IMEI search, law enforcement learned that numerous stolen cell phones were sold to EcoATMs

21

located inside stores. An EcoATM is an automated kiosk that pays cash instantly for recycling cell phones to help reduce electronic waste. According to the EcoATM website, a state-issued identification is required to sell a device.

38.     On August 13, 2024, at approximately 1:15 p.m. (i.e., approximately one hour after the Geeks Zone robbery), phones taken in the Geeks Zone robbery were sold at an EcoATM located inside a Walmart at 5885 Kingstowne Boulevard, Alexandria, Virginia. According to Google Maps, the Walmart is approximately 20 miles from the Red Roof Inn. EcoATM records showed that a black male using a District of Columbia driver's license bearing a name with initials K.M. sold approximately five phones taken in the Geeks Zone robbery. (The black male using the EcoATM was later determined to be KIRKLAND, who presented an identification with someone else's name; the District of Columbia driver's license bearing the name with initials K.M., which was recovered after the arrest and execution of the search warrant at KIRKLAND's residence, was located inside a wallet also containing an identification in KIRKLAND's name.) The black male had long dreadlocks, wore gray New Balance sneakers (which appeared similar to Subject 1's sneakers in both robberies), and appeared to wear a GPS monitoring device on his ankle.

39.     At that time, the black male was accompanied by a female who attempted to sell a phone to the EcoATM that was taken in the Geeks Zone robbery. This female also sold another phone at the time to the EcoATM that was not on the Geeks Zone stolen inventory list. The female matched the witnesses' description of the getaway driver for the Geeks Zone robbery. Surveillance video and still images showed that the female, who wore a tan/cream-colored sleeveless bodysuit, was heavier set with somewhat curly hair that appeared to be dyed on the ends. The female provided a Virginia driver's license with the name BRIANNA MAMIE OCEOLIA ARCHIE (i.e., the registered owner of the Honda believed to be the Geeks Zone robbery getaway vehicle).

22

Surveillance video and still images of the Walmart parking lot revealed that ARCHIE and the black male arrived in what appeared to be the Honda and walked into the store together. Based on surveillance video, ARCHIE and the black male at times stood together; at one moment, ARCHIE touched the forearm area of the black male and picked something off his shirt; and, at another point, ARCHIE held a phone to her ear, while the black male stood in front of the EcoATM.



(Inside Walmart)



(Inside Walmart at EcoATM)



(EcoATM image of KIRKLAND using K.M. DC ID)



(EcoATM image of ARCHIE)

40.    According to EcoATM records, ARCHIE sold several other phones both before and after the Geeks Zone robbery. At approximately 7:12 p.m. on August 11, 2024 (i.e., approximately 19 days after the Boost Mobile robbery), ARCHIE sold a cellular phone taken in

the Boost Mobile robbery to an EcoATM inside the same Walmart. On August 13, 2024, at approximately 5:13 p.m. (i.e., approximately 5 hours after the Geeks Zone robbery), at the same Walmart, ARCHIE sold two cellular phones, one of which was taken in the Geeks Zone robbery. On August 14, 2024, at approximately 10:34 a.m. (i.e., the day after the Geeks Zone robbery), ARCHIE sold a cellular phone taken in the Geeks Zone robbery at an EcoATM located inside a Safeway Grocery store located at 6118 Arlington Boulevard, Falls Church, Virginia. Several minutes prior, the black male using the same District of Columbia driver's license bearing the name with initials K.M. attempted to sell a cellular phone stolen in the Geeks Zone robbery. An image from the EcoATM showed ARCHIE standing next to the black male.

41.     On August 29, 2024, ARCHIE was arrested for possession of stolen property by FCPD. During a recorded interview, ARCHIE admitted to being the driver during the Geeks Zone robbery, to selling the phones at the EcoATMs, and to being aware that "Cosmo" (who law enforcement has identified as PAIGE) and KIRKLAND had guns; ARCHIE claimed she felt threatened and was forced to participate.

42.     During the course of the investigation, law enforcement identified the black male shown with ARCHIE at the EcoATMs as KIRKLAND. KIRKLAND was on GPS monitoring as a condition of his pretrial release for a pending D.C. Superior Court case. Preliminary GPS records received by law enforcement showed KIRKLAND's GPS placed him in the area at the dates and times of the Boost Mobile and Geeks Zone robberies. (Official GPS records obtained from the District of Columbia Pretrial Services after KIRKLAND's arrest showed that KIRKLAND was in and around the area at the times of both robberies; at the Exxon when PAIGE was there on July 25, 2024; at the Red Roof Inn consistent with the times the Honda was there on August 13, 2024; and at the Walmart after the Geeks Zone robbery.)

43.     On August 29, 2024, KIRKLAND was arrested at his residence in Falls Church, Virginia by FCPD during the execution of a search warrant.  During the search of the residence, FCPD seized items including a handgun with a tan/brown slide that was found in a bag also containing a credit card in KIRKLAND's name; that handgun was consistent in shape and size with the handgun carried by Subject 1 in the Geeks Zone robbery.  Also found in the residence was another handgun, as well as a cellular phone and iPad box with IMEI numbers associated with stolen merchandise from the Geeks Zone.

**PROBABLE CAUSE AS TO THE SUBJECT PHONE**

44.     Your Affiant conducted law enforcement database checks (Accurint) which revealed that telephone number 571-513-1256 was associated with ARCHIE.  An interview was conducted with a representative from Virginia Probation who provided telephone number 571-513-1256 as a number on file for ARCHIE.  Records from AT&T showed that telephone number 571-513-1256 was registered to ARCHIE during the summer of 2024 with a home address of 15317 Dillwyn Ct., Woodbridge, Virginia.  This is the same address listed on ARCHIE's driver's license.

45.     FCPD obtained a search warrant for the physical phone that was seized from ARCHIE at the time of her arrest on August 29, 2024 and, following execution of that warrant, it was determined that the device's phone number was  the same as above, 571-513-1256.  A physical extraction report of the phone showed a setup date of April of 2022.

46.     AT&T records for telephone number 571-513-1256 showed a listed service start date of February 7, 2023.  The records provided information of incoming and outgoing calls on August 13, 2024.  These records also registered a call approximately an hour and a half prior to the robbery at Geeks Zone to a telephone number associated with KIRKLAND.  There was no

25

time duration for this call listed in the records. The AT&T records also showed data usage, which recorded times leading up to the robbery at the Geeks Zone as well as after. In addition, on August 11, 2024, and August 14, 2024, there are records from AT&T that reflect call history and data usage.

## TIME PERIOD OF INFORMATION REQUESTED

47.    This application seeks to collect the information described in Attachment B from AT&T during a time period centered around the commission of the Geeks Zone robbery on August 13, 2024. The requested time period begins on August 6, 2024, one week before that robbery and ends on August 20, 2024, one week after that robbery. The time period begins before and ends after the Geeks Zone robbery in order to capture steps taken by ARCHIE and her co-conspirators before, during, and after the Geeks Zone robbery. For example, as discussed above, there is evidence that ARCHIE and her co-conspirators sold stolen phones at EcoATMs before and after the Geeks Zone robbery, including on August 11, 13, and 14, 2024. Location information could lead to the identification of other locations where ARCHIE and her co-conspirators sold phones following one or both robberies.

48.    Records from this time period are also requested to help establish a pattern of life, which would enable law enforcement to establish whether ARCHIE ordinarily frequented the areas where the Geeks Zone robbery occurred and the extent of her physical contact with co-conspirators. During the course of this investigation, ARCHIE was arrested on two separate occasions, both at 2803 Poag Street, Alexandria, Virginia 22303. ARCHIE advised she was staying at the Poag Street address during the weekdays. This is not the same address listed on her driver's license, which is 15317 Dillwyn Ct, Woodbridge, Virginia. It is your Affiant's understanding the Dillwyn Ct address belongs to her family. This address is approximately 3.5

26

miles from the Geeks Zone robbery address. A longer duration of historical data acquired can assist in developing a pattern for the cellular device. A smaller duration could make it difficult to determine if it is unusual for the phone to appear in the area where the Geeks Zone robbery occurred.

## TRAINING AND EXPERIENCE

49.      In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

50.      Based on my training and experience, I know that AT&T can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. I know that for each communication a cellular device makes, its wireless service

27

provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication.

51.     Based on my training and experience, I also know that some wireless service providers also collect per-call measurement data, which these providers may refer to as "PCMD," "real-time tool data" ("RTT"), "True Call" data, "timing advance" data, or "location database of record" data ("LOCDBOR").  This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

52.     Based on my training and experience, I know that wireless providers such as AT&T typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers such as AT&T typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

53.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

54.     I further request that the Court direct AT&T to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on AT&T, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

CHARLES ROONEY    Digitally signed by CHARLES
                  ROONEY
                  Date: 2025.01.31 11:14:28 -05'00'

Charles Rooney
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to me by telephone in
accordance with Fed. R. Crim. P. 4.1 on
January 31, 2025.

Lindsey R Vaala    Digitally signed by Lindsey R Vaala
                   Date: 2025.01.31 14:18:57 -05'00'

The Honorable Lindsey R. Vaala
United States Magistrate Judge

29

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number 571-513-1256, with International Mobile Equipment Identity ("IMEI") 354696407941159  ("the Account"), that are stored at premises controlled by AT&T Corporation ("the Provider"), headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida 33408.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **August 6, 2024 to August 20, 2024**:

    a.  The following information about the customers or subscribers of the Account:

        i.  Names (including subscriber names, user names, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.  Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

    viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

  b.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

    i.  the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

    ii.  all available cell site locations and sectors for all outgoing and incoming voice, SMS, MMS, and data transactions;

    iii.  information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received; and

    iv.  information regarding any timing advance location data and or Location Database of Record (also known as "LOCDBOR") data.

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 924(c)(1)(A)(ii) (use of a firearm during and in relation to a crime of violence), 18 U.S.C. § 1951 (obstruction of interstate commerce by means of robbery), 18 U.S.C. § 922(g) (possession of a firearm by a prohibited person), and 18 U.S.C. § 371 (conspiracy), involving **BRIANNA ARCHIE** and any co-conspirators during the period **August 6, 2024 to August 20, 2024.**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by **[PROVIDER]**, and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of

**[PROVIDER]**. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of **[PROVIDER]**, and they were made by **[PROVIDER]** as a regular practice; and

    b.    such records were generated by **[PROVIDER'S]** electronic process or system that produces an accurate result, to wit:

        1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of **[PROVIDER]** in a manner to ensure that they are true duplicates of the original records; and

2.    the process or system is regularly verified by **[PROVIDER]**, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____       _____
Date                            Signature

35